**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
**JOHN P. CARWAY,**                          :
                                             :
                          **Plaintiff,**     :        **REPORT AND**
                                             :        **RECOMMENDATION**
            **-against-**                    :
                                             :        **06 Civ. 13090 (___)(LMS)**
**MICHAEL J. ASTRUE,**                       :
**Commissioner of Social Security,**         :
                                             :
                          **Defendant.**     :
-------------------------------------------------------------X

**TO:   THE ASSIGNED DISTRICT JUDGE.**

         John P. Carway brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review

of the final decision of the Commissioner of Social Security (the "Commissioner"), which found

that he was not entitled to disability insurance benefits under the Social Security Act (the "Act").

Currently pending before the Court are the Commissioner's motion and Plaintiff's cross-motion

for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

For the reasons that follow, I conclude, and respectfully recommend that Your Honor should

conclude, that the Commissioner's motion should be granted and Plaintiff's cross-motion should

be denied.

**I.      BACKGROUND**

         **A**.     **Procedural History**

         On August 25, 2004, Plaintiff applied for disability insurance benefits.  Administrative

Record ("AR") 37-40.  Plaintiff alleged disability since April 30, 2004, due to back pain, leg

pain, and numbness in his legs and feet.  Id. 37.  Plaintiff's application was denied on

1

November 3, 2004.  Id. 24-27.  Plaintiff thereafter requested a hearing before an Administrative

Law Judge ("ALJ").  Id. 28.  Following the July 20, 2005, hearing, the ALJ issued a decision, on

October 11, 2005, finding that Plaintiff was not disabled within the meaning of the Act and was

not entitled to disability insurance benefits.  Id. 13-20.  Plaintiff filed a request for review of the

ALJ's decision with the Appeals Council.  Id. 8-9.  On September 7, 2006, the Appeals Council

denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the

Commissioner.  Id. 3-5.

On November 9, 2006, Plaintiff commenced the instant action in this Court, alleging that

the ALJ wrongly denied him disability insurance benefits.  See Complaint, Docket # 1.  After

filing an Answer (Docket # 5), the Commissioner filed a motion for judgment on the pleadings

on the ground that the ALJ's decision was supported by substantial evidence.  Docket #'s 8-9.  In

response, Plaintiff cross-moved for judgment on the pleadings on the grounds that (1) the ALJ

incorrectly relied on the Medical-Vocational Guidelines; (2) the ALJ incorrectly discounted

Plaintiff's subjective complaints of pain; (3) the ALJ failed to provide a "function-by-function"

analysis in determining Plaintiff's residual functional capacity; and (4) the ALJ violated the

treating physician rule and failed to adequately develop the administrative record.  Docket #'s

10-11.

### B.   Medical Evidence

#### 1.   Prior to the April 30, 2004, Alleged Onset of Disability

Dr. Patrick O'Leary, a spinal surgeon, performed surgery on Plaintiff for a disk

herniation in December, 1997.  Id. 99.  The surgery, from all reports, was successful.  Id. 99,

110.  Almost six years later, on August 26, 2003, Dr. Peter Tsairis, a neurologist, saw Plaintiff

for complaints of severe back pain and bilateral leg discomfort, primarily in the left leg.  Id. 110.

Plaintiff claimed to have injured his back the previous year with minimal pain and stated that

three weeks prior to his appointment with Dr. Tsairis, he had thrown his back out when lifting

his son.  Id.  Upon examination, Dr. Tsairis noted that there was no focal atrophy, knee reflexes

were asymmetrical,[1] ankle jerks and hamstring reflexes were normoactive and symmetrical,

sensation was intact, gait was normal, deep knee bend could be performed without difficulty,

passive and reversed straight leg raising was painless, and the cervical range of motion was

unrestricted and painless.  Id.  Dr. Tsairis' impression was "[c]hronic low back pain/sciatica

secondary to lumbar spondylosis and possible stenosis.  No neurological deficit nor any

significant mechanical nerve tension signs."  Id.  Dr. Tsairis stated that Plaintiff was "disabled

with his symptoms."  Id.

On October 7, 2003, Plaintiff had a CT myelogram of his lumbar spine.  Id. 107-08.  The

myelogram indicated that there was a central L4-5 slightly descending herniation.  Id. 107.  It

was noted that while this herniation was the same size as in an MRI from 2002, it was

considerably smaller than in 1997.  Id.  Nonetheless, the herniation truncated the left L5 root

sleeve on the extension in the lateral recess and effaced the right root sleeve.  Id.  It was also

noted that a central L5-S1 bulge with annular tear was unchanged in size since 1997, and that

there was mild bulge at L3-4.  Id.

On October 14, 2003, Plaintiff returned to Dr. Tsairis for review of the lumbar CT

myelogram.  Id. 109.  Upon this review, Dr. Tsairis remarked that he thought "the pathology at

L4-5 [was] significant" as there was stenosis related to the disk and compromise at both L5 roots

---

[1] Left knee reflexes were depressed.  Id. 110.

which correlated with Plaintiff's symptomatology.  Id.  Dr. Tsairis recommended Plaintiff for surgical decompression despite the absence of neurologic deficits or any significant mechanical nerve tension signs.  Id.

On November 10, 2003, Plaintiff saw Dr. O'Leary "for evaluation of sciatic pain in his left leg and low back pain since an automobile accident in May of 2001."  Id. 99.  Plaintiff reported that the pain had been getting worse and that the low back pain radiated down into his legs, mainly on the left side.  Id.  Dr. O'Leary reported that Plaintiff had diminished reflexes in his left knee and normal reflexes in the right knee and ankles and that sensation to touch was intact, power testing was normal, and nerve tension signs were negative.  Id.  Dr. O'Leary remarked that Plaintiff could walk on his toes and heels and that his posture and movements were "quite good."  Id.  In reviewing Plaintiff's CT myelogram from October 7, 2003, Dr. O'Leary noted that Plaintiff had a small recurrent disk herniation at L4-5 with some incomplete filling of the L5 nerve roots on both sides.  Id.  Dr. O'Leary also noted that an MRI "from some time ago" showed disk degeneration at L3-4, L4-5, and L5-S1.  Id.  Dr O'Leary's overall impression was that of "recurrent disk herniation at L4-5 with impingement related to recess stenosis at L4-5 on both sides."  Id.

### 2.   Subsequent to the April 30, 2004, Alleged Onset of Disability

#### a.  Treating Sources

On August 23, 2004, Plaintiff saw Dr. John Juliano for his complaints of "left-sided low back pain and left leg pain with numbness and tingling intermittently in the left low leg."  Id. 111.  Dr. Juliano noted that Plaintiff was recommended for spinal fusion, which he declined, and that Plaintiff had had no pain management.  Id.  Plaintiff was seeking "physical therapy and

4

follow-up for his back." Id.   Upon examination, Dr. Juliano noted that the straight leg test was

negative bilaterally, that Plaintiff had an antalgic gait and came in using a cane.  Id.  Strength

testing, knee flexion, ankle dorsiflexion, plantar flexion, and EHL testing were 5/5 bilaterally.

Id.  Plaintiff had an absent patellar tendon reflex on the left.  Id. 112.  Dr. Juliano's impression

was "[l]ow-back pain with multiple disc degenerations.  Spinal fusion has been recommended.

Patient has declined."  Id.  Dr. Juliano's treatment plan was to hold off on the surgery and on

pain management per Plaintiff's request.  Id.  Dr. Juliano gave Plaintiff a prescription for

physical therapy for his back two times a week for four weeks and a refill of his Lortab.  Id.

On February 17, 2005, Dr. Juliano indicated that Plaintiff's symptoms were unchanged

since his last visit.  Id. 124.  Plaintiff's sensory examination and strength remained intact; he had

symmetric range of motion and a negative straight leg raising test bilaterally.  Id.  Dr. Juliano's

impression was "[c]hronic low back pain, status post disce[c]tomy 1997; the patient does not

desire surgical intervention, given his symptoms have taken a down hill course."  Id.  Dr. Juliano

once again prescribed physical therapy.  Id.

On April 7, 2005, Plaintiff once again saw Dr. Juliano, who noted that Plaintiff's back

symptoms were improving with physical therapy.  Id. 125.  Dr. Juliano reported that the

neurovascular examination remained intact and that Plaintiff had a negative straight leg raising

test bilaterally.  Id.  However, Plaintiff had some tenderness and spasm in the midline of his back

at his scar.  Id.  Plaintiff was to continue physical therapy and was given Darvocet for pain since

Hydrocodone was too strong.  Id.

On June 14, 2005, Dr. Juliano noted that Plaintiff's back pain had shifted to the upper

lumbar region on his left side, but that Plaintiff had no leg pain, no neurological symptoms, and

no weakness in the lower extremities.  Id. 126.  Plaintiff requested a new medication as the

Hydrocodone was making him too sleepy.  Id.  Upon examination, Dr. Juliano reported some

tenderness in the paralumbar muscle, mid lumbar region.  Id.  He noted that Plaintiff had

negative straight leg raising and negative log roll.  Id.  Dr. Juliano indicated that Plaintiff had a

normal gait and was neurovascularly intact on the lower extremities.  Id.  The treatment plan was

to continue with pain medication, although fusion and epidural steroids were discussed as

possible options.  Id.

Plaintiff attended nine physical therapy sessions between August 25, 2004, and October

10, 2004, and an additional three sessions between March 4, 2005, and March 11, 2005.  Id. 140-

41.  His physical therapist, Glenn Slater, completed a questionnaire entitled, "Medical Source

Statement of Ability to Do Work Related Activities (Physical)," on December 10, 2004, and

again on July 5, 2005.  Id. 127-34.  In the 2004 questionnaire, Slater indicated that the ability to

lift, carry, stand, walk, sit, push, and pull were all affected by Plaintiff's impairment, with

Plaintiff being able to occasionally lift less than ten pounds, stand/walk less than two hours in an

eight-hour workday, and sit less than six hours in an eight-hour workday.  Id. 131-32.  Slater also

noted that Plaintiff was limited in his ability to push and pull in both his upper and lower

extremities.  Id. 132.  Slater also indicated that Plaintiff could never climb, kneel, crouch, or

stoop and could only occasionally balance and crawl.  Id.  Slater also noted that Plaintiff was

limited to only occasional reaching and handling, but that he could frequently finger and feel.  Id.

133.  Plaintiff did not have any visual/communicative limitations or any environmental

limitations.  Id. 133-34.  The 2005 questionnaire indicated the same limitations, with the only

difference being that Plaintiff could occasionally carry ten pounds and frequently carry less than

6

ten pounds.[2] Id. 127-30.

**b.      Consultative Examiner**

On October 12, 2004, Plaintiff was seen by consulting physician, Dr. Marc Appel, at the request of the New York State Office of Temporary and Disability Assistance. Id. 114-17. Dr. Appel reported that Plaintiff complained of constant pain in the lower back area that radiated to the buttock, the outer aspect of the thighs, the legs, and occasionally the feet, with no numbness or tingling. Id. 116. Plaintiff's daily activities were reported as self-care, reading the paper, watching television, and watching his children. Id. Dr. Appel noted that Plaintiff could drive a car. Id.

Upon examination, Dr. Appel observed that Plaintiff arose from a seated position with no significant problems and that he was able to dress, undress, and bend without significant problems. Id. Dr. Appel reported that Plaintiff could bend forward 80 degrees with his fingertips reaching above his ankles and that Plaintiff had full extension, rotation, and lateral bend. Id. Plaintiff could stand on his toes and his heels, had a good range of motion with all joints, and had normal finger and hand dexterity. Id. Dr. Appel noted that there was no muscle spasm or atrophy. Id. Plaintiff was able to straight leg raise 60 degrees bilaterally. Id. Plaintiff did not have any subluxation, contractor, ankylosis, instability, redness, heat, or swelling. Id. 117. Plaintiff's motor function was recorded as 5/5 for the right and left upper and lower extremities. Id. Plaintiff's sensation was intact to light touch and his reflexes were symmetrical and equal in the right and left upper and lower extremities. Id.

---

[2] In the 2004 questionnaire, these two categories were reversed with it being indicated that Plaintiff could occasionally lift less than ten pounds and frequently lift ten pounds.

Dr. Appel's diagnosis was that Plaintiff was "status post spinal surgery with recurrent herniation and chronic lower back pain." Id.  Dr. Appel opined that Plaintiff could perform sedentary activities but was unable to bend, carry, or lift on a repetitive basis, and "[h]is restrictions would be nothing greater than 10 pounds." Id.

### c.  Disability Analyst

A Physical Residual Functional Capacity Assessment was completed on October 26, 2004, by a state agency disability analyst. Id. 118-23.  This assessment indicated that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand/walk for six hours in an eight-hour workday, sit for six hours in an eight-hour workday, and was not limited in his ability to push and/or pull, except as shown for lift and/or carry. Id. 119.  The assessment further indicated that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl. Id. 119-20.  Plaintiff was noted to have no manipulative, visual, communicative, or environmental limitations. Id. 120-21.

### C.  Other Evidence

At the time of the hearing, Plaintiff was 41 years old. Id. 148.  He lived with his wife and three children, who were six years, four years, and twenty months old. Id. 149.  Plaintiff had completed high school. Id. 150.  Plaintiff served as a New York City police officer for thirteen years from 1991 to 2004. Id. 38, 150.  Prior to his years in the Police Department, Plaintiff worked as a security guard for about a year. Id. 161.

Plaintiff stated that he had first injured his back when he fell down a flight of stairs while on patrol in April, 1997, as a result of which he had back surgery in December, 1997. Id. 155, 164.  Plaintiff stated that the back surgery eliminated his back pain until he injured his back

again in May, 2001, when he was thrown out of a police car.  Id. 164.  During his last three years

as a police officer, Plaintiff testified that he worked as firearms instructor,[3] which consisted

primarily of sitting behind a desk answering telephones and working on a computer.  Id. 151.

Plaintiff testified that he had difficulties with this desk duty as prolonged sitting would irritate

his back, and standing in any one position for a length of time also caused him back pain.  Id.

Due to his pain, Plaintiff stated that he was often out sick and that when he was at work, he

needed to take frequent breaks.  Id. 152.  Plaintiff testified that he retired from the Police

Department on April 30, 2004, due to his back condition.  Id.

Plaintiff testified that he has three herniated disks and constant pain in his back and legs.

Id. 153.  Plaintiff stated that the pain in his back got worse with prolonged sitting and prolonged

standing.  Id. 154.  He also testified that lying in bed was difficult and that walking and sitting in

a car hurt his back as well.  Id.  Plaintiff claimed that he could sit in one spot for 30 minutes,

stand in one spot for 10 to 15 minutes, walk one to two blocks before needing to stop, and pick

up 10 pounds, but he tried not to bend, did not kneel, and could stoop but it would cause pain in

his back.  Id. 155-56.  Plaintiff claimed to experience five bad days a week on which he suffered

from extreme pain, and two good days on which he would suffer moderate pain.  Id. 156.

Plaintiff testified that he did not play any sports, did not go for walks, and only did exercises

recommended by his physical therapist.  Id. 156-57.  Plaintiff did not have any hobbies other

than watching TV or reading, and did not have any social activities.  Id. 157.  He tried to go to

church once a week, and his wife drove him there.  Id.  He could not kneel in church because of

the pain.  Id.  Plaintiff stated that he had trouble getting pants, socks, and sneakers on.  Id.  He

_____

[3] As a result of his time as a firearms instructor, Plaintiff had some hearing loss.  Id. 153-54.

did not do any household chores except to sometimes help his wife load the dishwasher.  Id. 157, 166.[4]  Plaintiff testified that he occasionally changed a diaper or fed the kids food prepared by his wife.  Id. 167.

Plaintiff indicated that during a typical day, he would wake up between eight and nine o'clock in the morning, have breakfast, play with the kids and watch TV with them, have lunch, take a nap either while watching TV or in bed, hang around the house with the kids or by himself, have dinner, help put the kids to bed, watch TV or read, and go to bed at ten or eleven o'clock at night.  Id. 158-59.  He testified that he had difficulty sleeping because of the pain and that he needed to use five or six pillows in order to prop himself into a position in which he could sleep.  Id. 158.   While Plaintiff stated that he could drive, he testified that he did so seldomly because he had difficulty getting in and out of a car, as well as difficulty sitting in a car.  Id. 150.

At the time of the hearing, Plaintiff testified that he was on Hydrocodone, Cyclo-benzaprine, and a muscle relaxer.  Id. 165.  He stated that he had attended physical therapy twice a week for about ten months, but that he stopped attending physical therapy two months before the hearing because while the physical therapy helped for the time he was there, the traveling had gotten to be too much for him.  Id. 166.

---

[4] Elsewhere in the record, Plaintiff reported that he went shopping once a week with his wife.  AR 84.

## II.   **APPLICABLE LEGAL PRINCIPLES**

### A.  **Standard of Review**

The scope of review in an appeal from a social security disability determination involves two levels of inquiry.  First, the court must review the Commissioner's decision to determine whether the Commissioner applied the correct legal standard when determining that the plaintiff was not disabled.  Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999).  Failure to apply the correct legal standard is grounds for reversal of the ruling.  Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984).  Second, the court must decide whether the Commissioner's decision was supported by substantial evidence.  Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003).  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. at 106 (internal quotation marks and citations omitted).  When determining whether substantial evidence supports the Commissioner's decision, it is important that the court "carefully consider[] the whole record, examining evidence from both sides."  Tejada, 167 F.3d at 774 (citing Quinones v. Chater, 117 F.3d 29, 33 (2d Cir. 1997)).  "It is not the function of a reviewing court to decide *de novo* whether a claimant was disabled."  Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (citation omitted).  If the "decision rests on adequate findings supported by evidence having rational probative force, [the court] will not substitute [its own] judgment for that of the Commissioner."  Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).  Moreover, the ALJ "has an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings, regardless of whether the claimant is represented by counsel."  Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citations omitted).

**B.** <u>**Determining Disability**</u>

The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In evaluating a disability claim, regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must follow. <u>See</u> 20 C.F.R. § 404.1520(a)(4).

First, the Commissioner will consider whether the claimant is working in "substantial gainful activity." <u>Id.</u> at § 404.1520(a)(4)(i),(b). If the claimant is engaged in "substantial gainful activity," then the Commissioner will find that the claimant is not disabled. <u>Id.</u> Second, the Commissioner considers the medical severity of the claimant's impairments. <u>Id.</u> at § 404.1520(a)(4)(ii). The claimant's impairment will not be deemed severe "[i]f [he or she] do[es] not have any impairment or combination of impairments which significantly limits [his or her] physical or mental ability to do basic work activities." <u>Id.</u> at § 404.1520(c). Third, if it is found that the claimant's impairments are severe, the Commissioner will determine if the claimant has an impairment that meets or equals one of the impairments presumed severe enough to render one disabled, listed in Appendix 1 to Part 404, Subpart P of the Social Security Regulations. <u>See</u> <u>id.</u> at § 404.1520(a)(4)(iii),(d). If the claimant's impairments are not on the list, the Commissioner considers all the relevant medical and other evidence and decides the claimant's residual functional capacity. <u>See</u> <u>id.</u> at § 404.1520(e). Then, the Commissioner proceeds to the fourth step to determine whether the claimant can do his past relevant work. <u>See</u> <u>id.</u> at § 404.1520(a)(4)(iv),(e)-(f). Finally, if it is found that the claimant cannot do his past relevant

work, the Commissioner will consider the claimant's residual functional capacity, age, education, and work experience to see if he or she can make an adjustment to other work.  See id. at § 404.1520(a)(4)(v),(g).

      The claimant bears the burden of proof on the first four steps of this analysis.  DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998) (citation omitted).  If the ALJ concludes at an early step of the analysis that the claimant is not disabled, he or she need not proceed with the remaining steps.  Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 2000).  If the fifth step is necessary, the burden shifts to the Commissioner to show that the claimant is capable of other work. DeChirico, 134 F.3d at 1180 (citation omitted).

## III.   DISCUSSION

      As required, in deciding Plaintiff's case, the ALJ applied the five-step sequential analysis set forth in the regulations.  First, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since April 30, 2004.  AR 14.  Second, the ALJ found that Plaintiff had a spinal impairment that was "severe."  Id. 16-17.  Third, the ALJ found that Plaintiff's impairment did not meet or equal in severity any category of the Listing of Impairments found in Appendix 1 to Subpart P of Part 404 of the Social Security Regulations.  Id. 17.  Therefore, he went on to assess Plaintiff's residual functional capacity.  Id.  The ALJ concluded that, in an eight-hour workday, Plaintiff could sit for 6 hours, stand/walk for 2 hours, and lift/carry 10 pounds.  Id. 18.  Thus, the ALJ found that Plaintiff had "the residual functional capacity to perform the full range of sedentary work."  Id. 19.  The ALJ determined in the fourth step that based on Plaintiff's residual functional capacity, Plaintiff would be unable to perform any of his past relevant work as a police officer.  Id. 18.  Therefore, the ALJ proceeded to the fifth step of the analysis, where the

burden shifted to the Commissioner to show that Plaintiff could "perform other jobs that exist in significant numbers in the national economy." Id. The ALJ relied upon the Medical-Vocational Guidelines (the "grids") contained in 20 C.F.R. Pt. 404, Subpt. P, App. 2, taking into account Plaintiff's residual functional capacity, age, education, and work experience. The ALJ noted that Plaintiff was 39 years old at his alleged onset date, which made him a "younger individual," that Plaintiff had a high school education, and that he had semi-skilled work experience. Id. Taking into account these factors, as well as Plaintiff's residual functional capacity for sedentary work, the ALJ applied Rule 201.28 in the grids, which directed a finding that Plaintiff was not disabled. Id.

The Commissioner contends that the ALJ's decision was supported by substantial evidence. Plaintiff, in contrast, asserts four challenges to the Commissioner's decision: 1) the ALJ's decision was not supported by substantial evidence since he relied exclusively on the grids despite Plaintiff's significant nonexertional impairments; 2) the ALJ did not properly assess Plaintiff's credibility and subjective complaints of pain; 3) the ALJ failed to provide a "function-by-function assessment" in determining Plaintiff's residual functional capacity; and 4) the ALJ applied incorrect legal standards in analyzing the medical opinion evidence of record and failed to develop the record concerning Plaintiff's nonexertional impairments.

### A.  The Use of the Medical-Vocational Guidelines

Plaintiff contends that the ALJ erred in utilizing the Medical-Vocational Guidelines, or the grids, in determining that he was not disabled because the record suggested that he suffered from nonexertional impairments as well.[5] Plaintiff's brief is not entirely clear regarding his

---

[5] A nonexertional impairment is "[a]ny impairment which does not directly affect [the
14

claimed nonexertional impairments, but he appears to claim that his chronic lower back pain was a nonexertional impairment.  See Mem. of Law in Opp. at 10-11.  In addition, as evidence of his nonexertional impairment, Plaintiff points to the opinion of consultative examiner, Dr. Appel, who noted that Plaintiff was unable to bend on a repetitive basis.[6]

While the use of the grids may be inappropriate when a plaintiff has nonexertional impairments, "the mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the grids."  Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986).  "If the guidelines adequately reflect a [plaintiff's] condition, then their use to determine disability status is appropriate."  Id. at 605.  It is only when the nonexertional impairments significantly limit a plaintiff's work capacity beyond that caused by the exertional impairments that an ALJ must utilize a vocational expert to assess whether other work exists in the national economy that a plaintiff could perform.  Id. at 605-06.  The phrase "significantly diminished" refers to "the additional loss of work capacity beyond a negligible one . . . that so narrows [a plaintiff's] possible range of work as to deprive him [or her] of a meaningful employment opportunity."  Id. at 606 (footnote omitted).

---

strength demands of work such as] the ability to sit, stand, walk, lift, carry, push, or pull.  This includes impairments which affect the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl, reach, handle, and use of the fingers for fine activities."  SSR 83-10, 1983 WL 31251, at *6 (S.S.A.).

[6] Dr. Appel, noted that Plaintiff could not "bend, carry or lift on a repetitive basis," AR 117, but limitations on carrying and lifting are exertional.  See 20 C.F.R. § 404.1569a(a).  In addition, Plaintiff's brief seems to refer to the limitation on bending as a nonexertional impairment, however, it instead would fall within the definition of a "nonexertional limitation," i.e., "[a]n impairment-caused limitation of function which directly affects capability to perform work activities other than the primary strength activities."  SSR 83-10, 1983 WL 31251, at *7.  Indeed, Plaintiff seems to use the terms "nonexertional impairment" and "nonexertional limitation" interchangeably.  See Mem. of Law in Opp. at 10 & n.2.

Plaintiff argues that the ALJ erred because he "provide[d] no analysis as to whether the non-exertional impairments that are alleged by Mr. Carway and referred to in the record time after time have any impact significant or otherwise in limiting his ability to perform the full range of sedentary work."  Mem. of Law in Opp. at 11-12.[7]  "Medical impairments and symptoms, including pain, are not intrinsically exertional or nonexertional.  It is the functional limitations or restrictions caused by medical impairments and their related symptoms that are categorized as exertional or nonexertional."  SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  In his brief, Plaintiff does not cite any nonexertional work demands that he cannot perform as a result of his nonexertional impairments, other than Dr. Appel's statement that Plaintiff was limited in his ability to bend on a repetitive basis.[8]  Yet despite Dr. Appel's statement, the record does not suggest that Plaintiff was completely prevented from bending.  See AR 116 ("He can dress and undress and bend without significant problem. . . . . He can bend forward 80 degrees with his fingertips, reaching above his ankles.  He has full extension, rotation and lateral bend.").  Moreover, an inability to bend on a repetitive basis is not inconsistent with a residual functional capacity for the full range of sedentary work.  As explained in Social Security Ruling 85-15, "If a person can stoop[[9]] occasionally (from very little up to one-third of the time)

_____

[7] The ALJ's rejection of Plaintiff's complaints of pain is addressed in Section III.B., infra.

[8] Nor do the medical records from Plaintiff's treating physicians indicate any nonexertional limitations or restrictions.

[9] Stooping was defined as "bending the body downward and forward by bending the spine at the waist."  SSR 85-15, 1985 WL 56857, at p. 5 (S.S.A. 1985).  SSR 85-15 does not mention "bending" among the various postural impairments but rather, "stooping, kneeling, crouching, and crawling," which are noted to be "progressively more strenuous forms of bending parts of the body, with crawling as a form of locomotion involving bending."  Id.

16

in order to lift objects, the sedentary and light occupational base is virtually intact."  SSR 85-15, 1985 WL 56857, at p. 5 (S.S.A. 1985); see also SSR 83-10, 1983 WL 31251, at *5 (S.S.A. 1983) (sedentary jobs do not involve a significant amount of stooping).  Additionally, despite his statement regarding bending, Dr. Appel opined that Plaintiff was able to perform sedentary work, see AR 117, and this assessment corresponds to the clinical findings:  Plaintiff had repeated negative straight leg raising tests; Plaintiff maintained a good range of motion; Plaintiff had no neurological deficits; and Plaintiff's strength testing was normal.  Id. 110, 111, 116, 124, 126.

In sum, based upon a review of the entire record, as summarized in detail in Sections I.B. and I.C., supra, as well as in the ALJ's Decision, see AR 15-18, there is substantial evidence supporting the ALJ's finding regarding Plaintiff's residual functional capacity to perform sedentary work, and the ALJ did not err in relying upon the grids in determining the Plaintiff was not disabled.

**B.    Credibility Determination**

Plaintiff claims that the ALJ erred in his evaluation of Plaintiff's credibility and subjective complaints of pain.  In his decision, the ALJ determined that Plaintiff's "allegations regarding his limitations [were] not totally credible."  AR 19.  An ALJ's credibility findings are entitled to deference by a reviewing court.  See Tejada, 167 F.3d at 775-76 (upholding ALJ's credibility determination, citing with approval Pascariello v. Heckler, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985), in which the district court noted "that after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility, the ALJ, in resolving conflicting evidence, may decide to discredit the claimant's subjective estimation of the degree of impairment.");  see also Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591

17

(2d Cir. 1984) ("It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant.  If the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain.") (internal quotation marks and citation omitted).  In rendering his decision in this case, the ALJ carefully considered all of Plaintiff's subjective complaints concerning his physical limitations, giving detailed reasons why he believed they were not entitled to great weight, and such findings are supported by substantial evidence in the record.  See AR 17-18.  Consequently, there is no basis to disturb these findings.[10]

### C.    Function-by-Function Assessment

Plaintiff contends that in determining his residual functional capacity, the ALJ was required to assess Plaintiff's capabilities on a function-by-function basis, and that the ALJ erred because he made no express findings as to Plaintiff's ability to push or pull[11] and failed to take

---

[10] To the extent that Plaintiff claims that the ALJ erred in failing to take account of Plaintiff's prior work history in making his credibility determination, the Second Circuit recently stated, "To be sure, a good work history may be deemed probative of credibility.  Work history, however, is just one of many factors appropriately considered in assessing credibility."  Carvey v. Astrue, No. 09-4438-cv, 2010 WL 2264932, at *3 (2d Cir. June 7, 2010) (internal quotation marks and citations omitted); see also Whitfield v. Astrue, No. 08-CV-6427, 2010 WL 2925962, at *5 (N.D.N.Y. July 23, 2010) ("It has been held that '[a] claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability,' however this factor alone is not dispositive of Plaintiff's credibility.  Rivera v. Schweiker, 717 F.2d 719, 725 (2d Cir.1983) (citation omitted).  In order to determine Plaintiff's credibility, it is proper for the ALJ to consider all factors relevant to Plaintiff's symptoms and base his determination on the totality of the evidence in the record.  Mimms v. Heckler, 750 F.2d 180, 185-186 (2d Cir.1984).").  In this case, the ALJ took into account the totality of the evidence in the record and found that the objective medical evidence, as well as Plaintiff's daily activities, did not support Plaintiff's claim of disabling symptoms.

[11] Exertional capacity takes into account seven strength demands:  sitting, standing,

into account the limitations noted by consultative examiner, Dr. Appel.  According to SSR 96-8p, the "RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945.  Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy."  1996 WL 374184, at *1 (S.S.A. July 2, 1996).

"While the Second Circuit has not specifically addressed the requirement of a function-by-function assessment, other circuits have held that although a function-by-function analysis is desirable, the ALJ's written opinion need not discuss each function, especially those functions for which no limitation is alleged.  Within the Southern District of New York, courts have reached different conclusions as to whether a function-by-function analysis is required or merely desirable."  Messina v. Astrue, No. 09 Civ. 2509, 2009 WL 4930811, at *5 (S.D.N.Y. Dec. 21, 2009) (footnotes omitted); see also Novak v. Astrue, No. 07 Civ. 8435, 2008 WL 2882638, at *3 (S.D.N.Y. July 25, 2008) ("Although the Second Circuit has not specifically addressed this question, several courts that have held that the function-by-function requirement of SSR 96-8p does not apply to the A.L.J.   The A.L.J. must avoid perfunctory determinations by considering all of the claimant's functional limitations, describing how the evidence supports [his or] her conclusions, and discussing the claimant's ability to maintain sustained work activity, but [he or] she need not provide a narrative discussion for each function.") (footnotes omitted).  In this case, before making his residual functional capacity determination, the ALJ discussed in detail Plaintiff's medical records, the report of the consultative examiner, and Plaintiff's testimony and

---

walking, lifting, carrying, pushing, and pulling.  SSR 96-8p, 1996 WL 374184, at *5.

allegations.  AR 17-18.  The ALJ then concluded, "[b]ased on the substantial evidence and hearing testimony[,] . . . that in an eight hour workday, [Plaintiff] has the residual functional capacity to sit for six hours[,] to stand/walk 2 hours and lift/carry 10 pounds."  Id. 18.  While the ALJ did not address every function individually, his Decision sufficiently explained how the evidence supported his residual functional capacity determination.

Although Plaintiff claims that the ALJ erred in failing to consider the limitations set forth in Dr. Appel's statement that Plaintiff was "unable to bend, carry or lift on a repetitive basis," AR 117, the ALJ noted such limitations, id. 16, but nonetheless concluded that Plaintiff retained the ability to perform sedentary work.  See 20 C.F.R. § 404.1567(a) ("Sedentary work involves lifting no more than 10 pounds at a time and occasionally[12] lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.").  As explained in Section III.A., supra, the ALJ's finding that Plaintiff had the residual functional capacity to perform sedentary work is not inconsistent with Dr. Appel's statement and is supported by substantial evidence.

### D.    The Legal Standards Applied to the Medical Opinion Evidence of Record

Under the Social Security regulations, a treating physician's opinion regarding the nature and severity of a claimant's impairments will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."  20 C.F.R. § 404.1527(d)(2).  If a treating physician's opinion is not given controlling weight, then various factors are applied in

---

[12] " 'Occasionally' means occurring from very little up to one-third of the time."  SSR 83-10, 1983 WL 31251, at *5.

determining what weight to give it:  (i) the length of the treatment relationship and the frequency

of examination; (ii) the nature and extent of the treatment relationship; (iii) the extent to which

the medical source provides relevant evidence to support an opinion; (iv) the extent to which the

opinion is consistent with the record as a whole; (v) whether the opinion is given by a specialist;

and (vi) other factors which may be brought to the attention of the ALJ.  Id. at §

404.1527(d)(2)(i)-(ii), (d)(3)-(d)(6).  The regulations further state, "We will always give good

reasons in our notice of determination or decision for the weight we give your treating source's

opinion."  Id. at § 404.1527(d)(2).  "Failure to provide 'good reasons' for not crediting the

opinion of a claimant's treating physician is a ground for remand."  Snell v. Apfel, 177 F.3d 128,

133 (2d Cir. 1999).

Plaintiff contends that the ALJ erred in applying the treating physician rule to the medical

opinions in this case.  First, Plaintiff claims that the ALJ erroneously disregarded the opinion of

his physical therapist.  A physical therapist is not an "acceptable medical source" as defined by

the Social Security regulations.  See 20 C.F.R. § 404.1513.  Nonetheless, Plaintiff argues that

while "[i]t may be true that the therapist's opinion cannot be afforded great weight," the ALJ

could not "simply dismiss" the physical therapist's opinion.  Mem. of Law in Opp. at 20.

Plaintiff asserts that the ALJ should have weighed the physical therapist's opinion in accordance

with SSR 06-3p, 2006 WL 2329939 (S.S.A. Aug. 9, 2006), which states that the factors set forth

in 20 C.F.R. § 404.1527(d), which are applied in the evaluation of medical opinions from

"acceptable medical sources," should likewise be applied in the evaluation of opinions from

"other sources."  However, SSR 06-3p also states, "The evaluation of an opinion from a medical

source who is not an 'acceptable medical source' depends on the particular facts of each case.

Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all of the evidence in that particular case."  2006 WL 2329939, at *5.

In this case, the ALJ reviewed the records from the physical therapist and considered the physical therapist's opinion that Plaintiff "could not even perform sedentary level exertion work."  AR 16.  The ALJ noted that in examining Plaintiff, the physical therapist had found that Plaintiff's range of motion "was markedly decreased in his trunk, however the limitation was not expressed in degrees and it is therefore not possible to know whether the limitation was mild, moderate or severe."  Id.  The ALJ decided not to give great weight to the physical therapist's opinion not only because a physical therapist is not an acceptable medical source, but also because "there [was] nothing in the evidence to support such significant physical limitations other than an unknown decrease in range of motion."  Id.

Plaintiff also asserts that it was error for the ALJ to fail to assign any weight to the medical opinions of either the consultative examiner or his treating physicians.  He notes that the ALJ did not even mention the medical opinion of treating physician Dr. Tsairis in his decision.  While the ALJ did not explicitly refer to Dr. Tsairis in his decision, he did refer to Exhibit 1F, which includes Dr. Tsairis' reports.  To the extent that Dr. Tsairis expressed an opinion that Plaintiff was "disabled with his symptoms," AR 110, the ALJ was not required to accept that opinion, since the ultimate determination of whether a claimant meets the statutory definition of disability is reserved to the Commissioner.  20 C.F.R. § 404.1527(e)(1); see also Snell, 177 F.3d at 133 ("That means that the Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability.  A treating

physician's statement that the claimant is disabled cannot itself be determinative.").  Furthermore,

Dr. Tsairis' reports are consistent with the reports of Plaintiff's other treating physicians.

Therefore, the ALJ's failure to mention them or explain the weight given to Dr. Tsairis' opinion

is harmless error.  See Skibinski v. Astrue, No. 08-CV-0482-A, 2010 WL 986524, at *3-*4

(W.D.N.Y. Mar. 17 2010) (ALJ's error in failing to state the weight given to a treating

physician's opinion was harmless where the physician's reports were consistent with the other

medical evidence); see also Walzer v. Chater, No. 93 Civ. 6240, 1995 WL 791963, at *9

(S.D.N.Y. Sept. 26, 1995) ("While the ALJ should have discussed [the treating physician's]

report in his decision . . . the ALJ's failure to do so was harmless error, since his written

consideration of [the treating physician's] report would not have changed the outcome of the

ALJ's decision.").  Likewise, the ALJ's failure to explain the weight that he gave to the opinions

of Plaintiff's other treating physicians constitutes harmless error, since "he engaged in a detailed

discussion of their findings[13] . . . and his decision does not conflict with them."  Jones v.

Barnhart, No. 02 Civ. 0791, 2003 WL 941722, at *10 (S.D.N.Y. Mar. 7, 2003); see also Pease v.

Astrue, No. 5:06-CV-0264, 2008 WL 4371779, at *8 (N.D.N.Y. Sept. 17, 2008) ("The ALJ

provided a detailed summary and analysis of the reports and records of all treating and

examining physicians . . . .  Therefore, the ALJ's failure to comment on the weight of evidence

was harmless error, and does not provide a basis for a remand to the Commissioner.") (citations

omitted).

     In this case, all of the medical evidence of record is consistent and reflects that while

Plaintiff had a recurrent small central disk herniation at L4-5 with stenosis and compromise at

---

    [13] See AR 15-18.

both L5 roots and a central disk bulge with an annular tear at L5-S1, see AR 99, 107-09, there were few signs of significant impairment, e.g., Plaintiff had repeated negative straight leg raising tests; Plaintiff maintained a good range of motion; Plaintiff had no neurological deficits; and Plaintiff's strength testing was normal. Id. 99, 110-12, 116-17, 124-26. The ALJ's determination that Plaintiff had the residual functional capacity to perform sedentary work is supported by the medical evidence in the record, all of which is discussed at length in the ALJ's Decision.

Finally, Plaintiff claims that the ALJ erred in failing to adequately develop the record concerning his nonexertional impairments, i.e., the limitations caused by his pain. However, Plaintiff does not explain how the record was deficient or how it ought to have been further developed on this issue. Plaintiff contends that "throughout his testimony at the hearing and throughout his conversations with his various doctors, [he] consistently speaks of his pain and how it affects his ability to function. Not to develop this area of the record is error." Mem. of Law in Opp. at 23. However, as explained in Section III.B., supra, the ALJ considered Plaintiff's allegations of pain and found them not to be entirely credible, which finding is supported by substantial evidence. Furthermore, as explained in Section III.A., supra, there is nothing in the record to suggest that Plaintiff suffered from any nonexertional impairments or limitations that would have impacted the ALJ's determination concerning his residual functional capacity.

## **CONCLUSION**

For the foregoing reasons, I conclude, and respectfully recommend that Your Honor should conclude, that the Commissioner's motion for judgment on the pleadings (Docket # 8)

should be granted, and Plaintiff's cross-motion (Docket # 10) should be denied.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days, plus an additional three (3) days, pursuant to Fed. R. Civ. P. 6(d), or a total of seventeen (17) days, see Fed. R. Civ. P. 6(a), from the date hereof, to file written objections to this Report and Recommendation.  Such objections, if any, shall be filed with the Clerk of the Court at the United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections may be made to the undersigned.

Dated: August 17, 2010
White Plains, New York

Respectfully submitted,

Lisa Margaret Smith
United States Magistrate Judge
Southern District of New York

A copy of the foregoing Report and Recommendation has been sent to the following:

Counsel of Record for Plaintiff and the Commissioner of Social Security